**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                  No. CR 07-1761 JB

MICHAEL C. REY,

       Defendant.

<u>**MEMORANDUM OPINION AND ORDER**</u>

**THIS MATTER** comes before the Court on the Defendant's Motion to Suppress Evidence Obtained From Illegal Search, filed March 22, 2009 (Doc. 112).  The Court held an evidentiary hearing on June 12 and 17, 2009.  The primary issue is whether the Court should suppress evidence of marijuana plants seized from Defendant Michael Rey's property in Sandoval County, New Mexico, near Jemez Springs.  This issue turns on: (i) whether the affidavit supporting the search warrant executed at Rey's property was supported by probable cause that was lawfully obtained; (ii) whether the area around a power line on which law enforcement officers walked to observe marijuana growing was part of the curtilage of Rey's property; (iii) whether the evidence seized should be suppressed as fruit of the poisonous tree of a potentially unlawful security sweep of Rey's property or whether the independent-source doctrine applies; and (iv) whether the warrant is invalid because the attesting officer did not disclose that he may have lacked jurisdiction under state law to execute the warrant in Sandoval County.  The Court finds that the aerial observations of growing marijuana are sufficient to establish probable cause.  Moreover, because the Court determines that the officers did not enter any curtilage on Rey's property when walking under a power line from which they could view marijuana on Rey's property, their search was lawful and thus the

information obtained from that vantage can be used to support a search warrant and cannot be the basis of the suppression of any evidence as fruit of the poisonous tree.  While the officers' later security sweep may have been unlawful -- an issue the Court need not decide -- the independent source doctrine applies here and so that sweep cannot require the suppression of the evidence seized under the warrant.  Finally, because the jurisdiction of officers under state law is irrelevant to whether there has been a Fourth Amendment violation and because officers do not need to disclose information unrelated to probable cause to a judicial officer when applying for a warrant, there were no material omissions that would invalidate the search warrant.  Accordingly, the seizure of the marijuana plants complied with Fourth Amendment requirements, and the Court will deny Rey's motion to suppress evidence.

## **FACTUAL BACKGROUND**

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.  The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of rule 12(d).  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure and the voluntariness of an individual's confession or consent to search.  See United States v. Merritt, 695 F.2d 1263 (10th Cir. 1982), cert. denied, 461 U.S. 916 (1983).  In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court.  See Fed. R. Evid. 1101(d)(1).  Thus, the Court may consider hearsay in ruling on a motion to suppress.  See United States v. Merritt, 695 F.2d at 1269.

**FINDINGS OF FACT**

1.      On August 29, 2006, Rio Rancho Department of Public Safety Sergeant Jamie Homann, Detective John Rose, Detective Karl Doering, Detective Kevin Dupre, and Officer Lisa Gowan, along with Drug Enforcement Administration ("DEA") Special Agent Kevin Small and members of the New Mexico National Guard, were engaged in a marijuana eradication operation for the Middle Rio Grande Valley Task Force.  See Transcript of Hearing at 15:13-25, 17:7-12 (Dupre & Braun)(taken June 12, 2009)(filed August 23, 2009)(Doc. 136)("I Tr.").

2.      At the time, Small had been a special agent with the DEA for over twenty years, and from 1988 to about 1990 or 1991, he was the DEA's New Mexico marijuana eradication coordinator.  See I Tr. at 72:25-73:9 (Small).

3.      At the time, Doering was a detective at the Rio Rancho Department of Public Safety who had experience investigating marijuana grows and was familiar with the appearance of marijuana plants.  See I Tr. at 153:11-154:4 (Braun & Doering).

4.      At the time, Dupre was joining the group to act as an aerial spotter.  See I Tr. at 15:13-25 (Braun & Dupre).

5.      A spotter in a helicopter looks for marijuana plants growing on the ground.  See I Tr. at 14:17-19 (Dupre).

6.      Dupre has been in law enforcement since 1988 and has previous experience in marijuana investigations, including experience conducting clandestine marijuana purchases and experience in Washington state working on eradicating marijuana groves and acting as a helicopter spotter.  See I Tr. at 14:1-6, 14:9-15 (Dupre).

7.      Several weeks before August 29, 2006, Dupre had attended an eight-hour class to become certified as a spotter in New Mexico, but from his previous experience in Washington was

-3-

familiar with how marijuana plants looked from the air.  <u>See</u> I Tr. at 14:22-15:1 (Dupre), 15:8-12 (Braun & Dupre).

8.      This training course was primarily in helicopter safety rather than spotting, and the certification came from the National Guard.  <u>See</u> I Tr. at 31:19-32:15 (Gorence & Dupre).

9.      Dupre considered himself to be a certified spotter because of the training and certification he received.  <u>See</u> I Tr. at 66:4-7 (Braun & Dupre).

10.     On the morning of August 29, 2006, at around 7:30 to 8:00 a.m., Dupre and the helicopter took off from Double Eagle Airport, and headed along the Rio Grande River over several pueblos, before coming to the Jemez Springs, New Mexico area.  <u>See</u> I Tr. at 16:23-24, 17:13-18:7 (Braun & Dupre).

11.     While flying at a height of about five-hundred feet in the in the area around Jemez Springs, near Soda Dam, Dupre observed bright green plants that contrasted with the surrounding vegetation, and which he thought, based on his training and experience, were marijuana plants.  <u>See</u> I Tr. at 18:17-25, 19:11-13, 19:19-22, 67:17-23 (Dupre & Braun).

12.     These plants appeared to be growing in pots and to have been arranged by a person, rather than growing wild.  <u>See</u> I Tr. at 18:23-25 (Dupre).

13.     The helicopter descended to a height of about one hundred feet for a better look, and Dupre became "pretty positive" that the green plants in the pots were marijuana plants.  I Tr. at 19:1-3 (Dupre).

14.     The plants were growing near some power lines along State Road 4.  <u>See</u> I Tr. at 19:25-20:7 (Braun & Dupre).

15.     Dupre believed that the plants he saw were marijuana, but could not say that the plants were without a doubt marijuana unless someone on the ground verified that they were.  <u>See</u> I

Tr. at 40:1-10 (Gorence & Dupre).

16.     Dupre saw a dome-like building near the area where he saw marijuana growing. <u>See</u> I Tr. at 19:13-15 (Dupre).

17.     Dupre radioed Doering, told Doering that Dupre has spotted marijuana growing and directed him and the other members of the task force on the ground towards the marijuana.  <u>See</u> I Tr. at 19:5-6, 20:1-3 (Dupre).

18.     As Dupre was guiding the posse towards the plants, the helicopter pilot told Dupre that they were low on fuel and needed to get back to the airport.  <u>See</u> I Tr. at 19:7-10 (Dupre).

19.     The area to which Dupre guided the other officers was a piece of property along New Mexico State Road No. 4.  <u>See</u> Boundary Survey Platte; I Tr. at 18:7-12 (Braun & Dupre).

20.     Dupre guided the officers to an area near the marijuana where he saw a drive and a cluster of mailboxes.  <u>See</u> I Tr. at 20:1-3(Dupre); <u>id.</u> at 156:12-157:6 (Doering).

21.     Doering and several other officers parked near the mailboxes by the drive, and were informed by Dupre that they were in the right place before Dupre told the officers that the helicopter was low on fuel and had to return to the airport.  <u>See</u> I Tr. at 157:2-25 (Doering & Braun).

22.     Small was parked and waiting outside the Santa Ana Star Casino when he heard Dupre announce that he had spotted something, which prompted Small to begin driving towards the Soda Dam area.  <u>See</u> I Tr. at 75:19-76:10 (Small & Braun).

23.     Small was the last member of the group to arrive at the site, and, when he arrived, the other officers were parked near the mailboxes at the bottom of the drive.  <u>See</u> I Tr. at 76:15-20 (Small); <u>id.</u> at 157:8-11 (Doering).[1]

_____

[1] Doering mentions that he believed the "DEA agent was also present," I Tr. at 157:10-11, but it is unclear whether the is referring to those officers initially present.  Doering is not clear on

24.     It took Small about thirty minutes to get to the area by the mailboxes where the other officers were gathered.  See I Tr. at 97:16-98:8 (Small & Gorence).

25.     The area was rural and mountainous.  See I Tr. at 18:15-17 (Dupre & Braun).

26.     The only easy access to the property was up the dirt drive. See Plaintiff's Exhibit 1, 15; Transcript of Hearing at 4:9-14 (Gorence & Rey)(taken June 17, 2009)("II Tr.").[2]

27.     The dome-like round structure on the property is a yurt, which is a round and at least semi-permanent building, made of wood and cloth with one room, similar to a cabin but without any utilities, that was erected on a wooden platform.  See Plaintiff's Exhibit 12; Defendant's Exhibit H-I; I Tr. at 89:4-6 (Small); 162:14-17(Doering).

28.     From most parts of the highway, the yurt is not visible through the trees.  See II Tr. at 12:2-10 (Rey & Gorence); Plaintiff's Exhibit 3, 4.

29.     Further up the drive from the mailboxes, a locked chain hung across the road, blocking access.  See Plaintiff's Exhibit 1, 15; I Tr. at 158:16-18 (Doering); II Tr. at 4:22-5:11 (Gorence & Rey).

30.     There were two No Trespassing signs and a Beware of Dog sign posted near the chain across the road.  See Plaintiff's Exhibit 1, 2; I Tr. at 158:17-24 (Doering & Braun); II Tr. at 5:6-11 (Gorence & Rey).

31.     Doering, Small, Ross, and Homann discussed the situation, and decided to head up a power-line right of way that ran off the side of the driveway between the drive and Route 4, which

_____

this point, however, while Small's testimony clearly, and with detail, indicates that he arrived last. See id. at 76:15-20 (Small); id. at 157:8-11 (Doering).  The Court finds that Small's recollection is accurate.

[2] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited versions.  Any final transcript may contain different page and/or line numbers.

appeared to them to be public, to see if they could confirm the presence of marijuana from the right of way.  See I Tr. at 158:1-9 (Doering & Braun).[3]

32.     The officers, walking single file with Small bringing up the rear, began heading up the drive and turned off the road, pushing through the trees to do so, and began walking under the power lines.  See I Tr. at 77:23-78:8 (Small).

33.     The officers left the drive to follow the path along the power lines before coming to the cable that blocked access further up the road and before the no-trespassing signs on the posts holding up the cable.  See I Tr. at 80:13-81:2 (Small & Braun); id. at 158:13-159:7 (Braun & Doering).

34.     To gain access to the path along the power lines, they did not have to pass through any gates, cross any fences, or otherwise bypass some man-made object.  See I Tr. at 81:14-18 (Braun & Small); id. at 159:16-18 (Braun & Doering); Plaintiff's Exhibit 4, 15.

35.     Doering assumed, because of the no-trespassing signs, that they were near private

_____

        [3] Rey takes the stance that some of the officers had already been up the power-line easement and onto Rey's property, and then came back down before Small arrived.  To support this view, Rey notes that Dupre talks about guiding the officers in, see I Tr. at 20:1-3 (Dupre), and contends that, because Small took thirty minutes to get to the meeting place by the mailboxes, the helicopter, which was low on fuel, must have already left.  From this testimony, Rey contends, the Court must conclude that Dupre guided the officers onto the property before Small arrived.  While there are some minor inconsistencies, the Court does not see sufficient evidence to support Rey's view.  First, Rey wants the Court to infer that, by "guiding in" the officers, Dupre guided the officers all the way along the power lines into the area where the marijuana was growing.  Dupre's testimony can also be interpreted, however, as that he only guided the officers to the drive area.  Doering's testimony supports this view, because he discusses the officers looking for the correct drive along the highway and being guided to that correct drive.  See I Tr. at 156:16-157:6 (Doering).  Second, other than possible inferences of an earlier search based upon the time lag, there is no direct evidence that the officers searched the property before Small's arrival, and the Court does not see a sufficient reason to doubt the direct testimony that the first search occurred once Small had arrived.  In any event, given that the Court is holding that the power-line area is not curtilage and that the independent-source doctrine applies, an earlier search predating Small's arrival would not change the Court's ultimate legal conclusions.

property.  See I Tr. at 183:11-13 (Gorence & Doering).

36.     Beyond the trees, the area around and under the power lines was relatively open, with the foliage largely cut away, creating a path of sorts, although there was still debris and moderately thick foliage on the ground.  See Plaintiff's Exhibit 14; I Tr. at 78:14-21 (Small); id. at 159:9-15 (Doering).[4]

37.     Occasionally, the officers would have to zigzag around thick foliage or trees, and could not follow directly under the power lines at all times.  See I Tr. at 87:3-6 (Small); id. at 159:20-23 (Doering).

38.     Near the second power-line pole the officers walked by, the view opened up some

_____

[4] Both Lawrence Trujillo, Rey's investigator who visited the property, and Rey himself testified that the area under the power lines is mostly impassable.  See I Tr. at 238:11-239:16 (Gorence & Trujillo); II Tr. at 20:9-17 (Gorence & Rey).  Trujillo agreed that one could get onto the power-line easement area from the drive without passing the chain across the drive, but maintained that it was too dense to traverse much further.  See I Tr. at 252:21-253:10 (Braun & Trujillo).  Trujillo admitted that there were various sections along the power line that were easily traversed, see id. at 255:10-24; Plaintiff's Exhibit 14, but said that to walk the entire length of the line to where the officers stood would require leaving the easement area for up to fifteen- or twenty-feet to bypass trees, see I Tr. at 255:25-256:8 (Braun & Trujillo).  From the Court's viewing of the relevant pictures offered into evidence, see Plaintiff's Exhibit 5, 14 & 15, and the video recording Trujillo recorded of the area, see Defendant's Exhibit N, it appears to the Court that the area under the power line is traversable.  There are areas of thick foliage and clear areas.  Trujillo admitted that, while one was required to occasionally step outside of the ground parallel to the power lines to bypass obstacles, it was possible to more or less follow the power line.  Moreover, Trujillo's observations and video recording are approximately two years after the search.  While that time is probably not enough for significant tree growth, as Trujillo maintains, see 239:5-13 (Trujillo), that time can account for the foliage becoming thicker, which would further indicate that the video, which the Court views as being largely consistent with Doering's and Small's testimony, does not undercut the officers' recounting of events.  The officers admit to having to zigzag or sidestep to follow the line.  See I Tr. at 87:3-6 (Small); id. at 159:20-23 (Doering).  Based upon all of this evidence, the Court concludes that the area is traversable but that one must occasionally leave the ground around the power line because of trees or dense bush.  Not being able to follow the power line at all times, however, does not effect the outcome of this motion, however, because the legal scope of the easement is irrelevant.  Leaving the area around the power line does not require entering into any areas with any more indicia of being curtilage than the area directly underneath the power lines.

and they could see the yurt.  See I Tr. at 79:20-80:7 (Small & Braun).

39.     Standing under the power lines, Small and Doering were able to see marijuana plants around a small tent, growing either in buckets or in plastic bags apparently full of soil.  See I Tr. at 82:24-83:14, 83:23-84:2 (Braun & Small); 160:2-4 (Doering); Plaintiff's Exhibit 7.[5]

40.     The distance from the easement to the tent was approximately twenty-five to thirty feet.  See II Tr. at 19:17-20:1 (Gorence & Rey).

41.     The distance from the tent to the yurt was approximately seventy feet.  See Plaintiff's Exhibit 6, 16.[6]

42.     Most of the plants around the tent were small, unusually small for marijuana in August Small thought, but there were a couple of larger plants as well.  See I Tr. at 83:8-11 (Small).

43.     Based upon his training and experience, Doering believed that the plants around the tent were marijuana.  See I Tr. at 160:19-21 (Braun & Doering).

44.     Concerned by the tent, which had grills and shelves nearby, the officers decided to clear the tent, announced themselves as police and unzipped the tent, but no one was inside.  See I Tr. at 87:21-23, 88:9-19 (Small & Braun).

----

[5] Rey contends that the vegetation was too dense for the officers to see any marijuana from the power line.  He notes that Plaintiff's Exhibit 7, which is a picture taken from in front of the tent, looking towards the tent and the power line behind it, reveals considerable foliage between the tent and the power lines.  While the foliage is somewhat dense, the Court can also observe a possible line of sight from an opening in the trees.  If one were standing in the right spot along the power line, the area around the tent would be visible.  See I Tr. at 116:6-12 (Small).  The Court does not see sufficient grounds to doubt Doering and Small's testimony that they could see marijuana while standing under the power lines.  Moreover, even if they could not see the full extent of the marijuana growing in that area, that they could see some plants is sufficient to support probable cause.

[6] There is no direct evidence of the distance between the yurt and the area of the easement where the officers stood.  Based upon the apparent distances shown in photographs, and Rey's estimate of the distance between the tent and the power lines, the Court estimates, however, that the distance was one-hundred feet or possibly more.

45.     Though concerned about their safety, the officers did not leave to get a search warrant at that time, because they thought there may be someone armed on the property out of view and because they did not know if there was a back road to the property which someone could use to enter the property and take away the evidence.  See I Tr. at 89:10-13 (Braun & Small); id. at 161:7-16 (Braun & Doering).

46.     The officers decided to perform a security sweep of the property.  See I Tr. at 89:7-92:17 (Braun & Small); id. at 162:3-165:3 (Braun & Doering).

47.     Between the yurt and the power lines is a largely open area, interspersed with, and surrounded by, trees.  See Plaintiff's Exhibit 13, 16.

48.     In the open area were indications, such as a fire pit, that the area was being used.  See II Tr. at 15:5-10 (Rey); Plaintiff's Exhibit 16.

49.     The open area sits over a hundred feet up the mountain from the highway.  See Plaintiff's Exhibit 13, 17.

50.     Doering and the other officers looked under the yurt and then forced open the locked door of the yurt using a pry bar.  See I Tr. at 162:22-163:18 (Braun & Doering).

51.     The officers searched for persons who could harm them, not evidence, but did not find any people or seize any evidence.  See I Tr. at 163:19-24 (Braun & Doering).

52.     Small walked up to the yurt and, peering through the windows, saw a bed, a drum set, a Coleman stove, and other signs of habitation.  See I Tr. at 90:7-24 (Small).

53.     Because someone could be hiding behind various items in the yurt, Small decided to enter and search the yurt.  See I Tr. at 90:15-91:1 (Braun & Small).

54.     The yurt had screen doors that were unlocked and then double doors on the inside that were locked.  See I Tr. at 107:19-108:7 (Gorence & Small).

55.     To get inside the yurt, officers had to force the doors open.  See I Tr. at 108:8-20 (Gorence & Small).[7]

56.     Small was not looking for evidence when he searched the yurt, and he did not see anyone in the yurt or seize anything from it.  See I Tr. at 91:2-7 (Braun & Small)

57.     Small then walked towards the back of the property, observing more marijuana plants along the way, until he reached a ravine, did not see any more marijuana, and concluded that there was no back way in.  See I Tr. at 91:10-25(Braun & Small).

58.     After completing the sweep, sometime before noon, Small and the other officers walked to the bottom of the drive, and waited there to prevent anyone from entering and destroying evidence until a search warrant arrived.  See I Tr. at 92:18-20, 93:9-10, 94:3-7 (Braun & Small).

59.     After the sweep, Doering asked Ross to go to the local Forest Service office in Jemez Springs.  See I Tr. at 184:9-12 (Gorence & Doering).

60.     A fire-management officer from the Forest Service arrived with a map of the area, from which the officers determined that the property they had searched was private property.  See I Tr. at 185:1-7 (Gorence & Doering).

61.     The officers decided to have Doering seek a search warrant because he had a Sandoval County commission card.  See I Tr. at 166:7-18 (Braun & Doering).

62.     The commission cards were given to officers outside Sandoval County, indicating that those officers were authorized to act in Sandoval County under a memorandum of

---

[7] It is unclear whether the door was forced or the lock was broken, as well as who forced the door.  Small recalls Doering forcing the door open, but he is not sure about all the details of searching the yurt.  See I Tr. at 108:8-109:4 (Gorence & Small).  Doering confirms this account. See id. at 163:15-18 (Doering).  The details of this incident, however, are ultimately not relevant given the applicability of the independent-source doctrine.

understanding.  See I Tr. at 21:21-23:8 (Dupre & Braun); 150:20-25 (Doering).

63.     Doering went to somewhere south of Jemez Springs, where he was able to get cell

coverage so that he could call Dupre, who told Doering he would meet him at Rio Rancho police

headquarters to help draft the warrant affidavit.  See I Tr. at 166:25-67:4 (Doering).

64.     With Dupre's assistance, Doering drafted the affidavit.  See I Tr. at 167:9-10, 167:22-

25 (Braun & Doering); Exhibit A to Hearing, Affidavit for Search Warrant.

65.     The affidavit reads:

>   Affiant is employed as a police officer with the Rio Rancho
>   Department of Public Safety, currently assigned to the Investigations
>   Division.  Affiant has eight years of law enforcement experience.
>   Including four years of criminal investigations and eighteen months
>   of narcotics investigation experience.   Affiant has investigated
>   numerous marijuana related cases including several growing
>   operations.
>
>   I, Detective Karl P. Doering being dully [sic] sworn, on my oath,
>   state that I have reason to believe that on the following described
>   premises, on the person described above:
>
>   The property/premises to be searched is located north of Jemez
>   Springs, New Mexico on the west side of New Mexico Highway Four
>   in Sandoval County, approximately 1.4 miles north of the Jemez
>   Springs Village limit.  The property is a rural plot with a dirt access
>   road from Highway Four.  The intersection of the access road &
>   Highway Four is located at datum point N 35 degrees 48.285
>   minutes/W 106 degrees 40.842 minutes, this location was obtained
>   by the use [of] a GPS device.  According to the National Forest
>   Service Fire Management Officer for the Santa Fe National Forest
>   Juarez Ranger District, this area is located on private property.  There
>   is no physical address on the property and the owner of the property
>   is unknown.
>
>   Also to be searched is the surrounding area, since I know through
>   training and experience that drug dealers often hide their drugs by
>   burying them or otherwise concealing them in and on the area
>   surrounding their area of operation.  I will be present during the
>   execution of the search warrant and will direct members of the Rio
>   Grande Middle Valley Narcotics Task Force.

-12-

**IN THE STATE OF NEW MEXICO, COUNTY OF SANDOVAL THERE IS NOW BEING CONCEALED CERTAIN PROPERTY, NAMELY:**

Marijuana and any other controlled substances enumerated in the New Mexico State Statutes as being a controlled substance. Any and all documents tending to show dominion and control over the above described location. Any and all documents, including, but not limited to, financial statements, receipts, ledgers, or other notes tending to show the laundering of money. Any and all photographs or films depicting places or persons possessing, negotiating, selling, purchasing, manufacturing, or distributing in marijuana or any controlled substance. Any communication devices used in the selling of controlled substance, including, but not limited to, cellular phones, pages, two way radios, computers and scanners. It is Affiant's experience and training that drug traffickers will often trade drugs for stolen property or ill begotten property. Any U.S. Currency or other fruits of the crime directly associated in the trafficking of controlled substances. Also to be seized are any and all firearms, ammunition, and explosive devices. Drug traffickers to protect drugs and drug money commonly use these devices. Surveillance equipment; including, but not limited to cameras, binoculars, recording devices, scanners and night vision used in the counter-surveillance of law enforcement.

The facts tending to establish the foregoing grounds for issuance of a Search Warrant are as follows:

On Tuesday, August 29, 2006, Officer Kevin Dupre, Rio Rancho Police Officer assigned to the Middle Rio Grande Valley Narcotics Task Force was conducting aerial operations for marijuana eradication. Officer Dupre is a certified spotter and observed growing marijuana under power lines parallel to Highway four in Jemez, NM. Officer Dupre observed numerous plants in pots. The plants had a unique color indicative of growing marijuana, which stands out from other vegetation in the area, based on his training and experience.

Office Dupre contacted Affiant, who was acting as ground support for the operation and directed him to the location of the suspected marijuana. Affiant and other Officers/Agents, approached the location along the power line right of way. Affiant observed numerous plants consistent with marijuana in his training and experience in plain view. Also located on the property was irrigation equipment, a tent, and a temporary structure described as a "yurt."

-13-

Affiant and other Officers entered the property to perform a security sweep and found no person(s) on the property.

**SUBSCRIBED AND SWORN BEFORE ME IN THE ABOVE NAMED COUNTY OF THE STATE OF NEW MEXICO.**

Both the Honorable George Eichwald, New Mexico District Judge, and Dupre signed the affidavit below this last sentence, and the affidavit was dated August 29, 2006, at 4:30 p.m.  See Affidavit at 2-3 (formatting in original).

66.     Doering believed that all the information contained in the affidavit to be accurate. See I Tr. at 168:1-3 (Braun & Doering).

67.     Doering and Dupre began contacting judges' offices and found out that Judge Eichwald would be available, but was leaving the office at 4:00 p.m.  See I Tr. at 164:15-20 (Doering).

68.     Meanwhile, Scott Harris, the coordinator of the Region One Narcotics Task Force, had called Sandoval County Undersheriff Tim Lucero to inform him of the search warrant that the officers were planning to obtain.  See I Tr. at 128:12-17 (Gorence & Lucero).

69.     The telephone call from Harris was the first Lucero had heard about the operation. See I Tr. at 128:23-129:2 (Gorence & Lucero).

70.     In response to Harris' request for assistance, Lucero told Harris that he would have one of his deputy sheriffs, Ventura Salas, meet with Doering to corroborate the information and help Doering with writing a warrant if there was sufficient probable cause.  See I Tr. at 129:12-130:3 (Lucero & Gorence).

71.     Harris called Doering and told Doering that Lucero had told him that Doering did not have a valid Sandoval County commission.  See I Tr. at 169:2-1 (Doering & Braun).

72.     Harris asked Doering to contact Lucero to clarify the situation. See I Tr. at 169:10-13

(Doering).

73.     Since 2003, when John Paul Trujillo became Sheriff of Sandoval County, Trujillo's office had a policy of providing commissions, authorized by state law, to law-enforcement officers of other agencies to give them authority to act within Sandoval County.  <u>See</u> I Tr. at 122:18-25 (Lucero).

74.     As part of granting the commissions, the Sandoval County Sheriff's Department was to be notified beforehand about any agency conducting law-enforcement operations pursuant to their county commissions.  <u>See</u> I Tr. at 127:3-10 (Lucero).

75.     Assuming proper notice was given, under normal circumstances an officer with a commission could obtain a search warrant in Sandoval County on his or her own.  <u>See</u> I Tr. at 140:11-16 (Braun & Lucero).

76.     Lucero and Doering spoke over the telephone, and Lucero told Doering that Doering did not have a valid commission for Sandoval County.  <u>See</u> I Tr. at 169:20-21 (Doering).

77.     Doering had his commission card on him, and he told Lucero that his commission card was valid.  <u>See</u> I Tr. at 169:21-24 (Doering).

78.     Lucero advised Doering that the commission was limited to DWI issues, but Doering disagreed and argued that it was a full commission, at which point Lucero told Doering he could consider the commission revoked because Doering's chief had not responded to a letter Sheriff Trujillo sent out about commission cards.  <u>See</u> I Tr. at 169:24-170:7 (Doering).

79.     Lucero told Doering that he would have to have Detective Chico Salas be the affiant on the warrant.  <u>See</u> I Tr. at 170:11-14 (Doering).

80.     Doering told Lucero that he did not think that having Salas be the affiant was appropriate, but that he would be willing to meet with Lucero and Salas on the way to Judge

-15-

Eichwald's office, which was in the same building as their offices.  <u>See</u> I Tr. at 170:14-20 (Doering).

81.     After Doering told Lucero that his commission was valid and that the officers would proceed with the warrant, Lucero told him they could, but the sheriff's department would not help. <u>See</u> I Tr. at 131:8-15 (Lucero).

82.     Lucero then spoke with Trujillo, who advised Lucero that, if Doering was not going to corroborate the warrant with the sheriff's department, then Doering's commission was revoked. <u>See</u> I Tr. at 132:17-133:4 (Lucero).

83.     Lucero called Doering back, telling him that if Doering did not corroborate the information, then Doering's commissions would be revoked.  <u>See</u> I Tr. at 133:1-4 (Lucero), <u>id.</u> at 143:13-144:6 (Lucero & Braun).

84.     At the judicial complex, Doering spoke with Salas, but Salas told him that he did not wish to be involved in the case.  <u>See</u> I Tr. at 170:22-171:1 (Doering).

85.     It was almost 4:00 p.m. and the officers back at the property were waiting for a warrant, so Doering decided to pursue the warrant himself.  <u>See</u> I Tr. at 171:5-9 (Doering).

86.     Judge Eichwald did not ask Doering about his authority to obtain or to execute the search warrant, and Doering did not volunteer any information about the dispute with Lucero.  <u>See</u> I Tr. at 172:1-7 (Braun & Doering).

87.     Doering has never informed a judge about his authority to obtain or to execute a warrant, and has never had a judge ask about whether he had such authority.  <u>See</u> I Tr. at 172:16-20 (Braun & Doering).

88.     Doering did not tell Judge Eichwald that the officers had forced entry into the yurt. <u>See</u> I Tr. at 219:10-220:2 (Gorence & Doering).

89.     Judge Eichwald issued a search warrant for the property.  <u>See</u> I Tr. at 172:21-23

(Braun & Doering); Search Warrant.

90.     Judge Eichwald was a Sandoval County judge.  See I Tr. at 171:12-14 (Braun & Doering).

91.     Upon leaving the judicial complex, Doering encountered Lieutenant Morrison from the Sandoval County Sheriff's Department, who asked where the property was located, and said he would be happy to assist in the search, and said he was sending several deputies out to help.  See I Tr. at 172:23-173:6 (Doering).

92.     When Doering returned to the property, Harris had arrived, the two of them reviewed the warrant, and Doering explained about the dispute with Lucero.  See I Tr. at 173:14-17 (Doering).

93.     Doering and Harris decided to execute the warrant and proceeded to cut away the cable across the drive with bolt cutters.  See I Tr. at 173:17-24 (Doering & Braun).

94.     None of the marijuana plants had been seized during the time between the sweep and the execution of the warrant.  See I Tr. at 173:24-174:2 (Braun & Doering).

95.     The officers seized numerous marijuana plants while executing the search warrant. See I Tr. at 174:5-10 (Doering).

96.     Rey is the owner of the property on which the officers found the marijuana plants. See II Tr. at 3:11-19 (Gorence & Rey).

97.     The only other access to the yard is to climb steep, unimproved, forested terrain, and one who did so would not be able to see the property from the bottom of the mountain at the roadway.  See II Tr. at 33:7-34:6 (Braun & Rey).

98.     Rey considered the property secluded and private, and he posted no-trespassing signs and secured the dirt drive with a locked chain to maintain the property's privacy.  See II Tr. at 4:22-5:11 (Gorence & Rey).

99.     At some time before the search, Rey also posted a no trespassing sign further down the road from the chain.  See II Tr. at 5-6.

100.    That no-trespassing sign is no longer on the property and was not on the property at the time of the search.  See I Tr. at 81:14-18 (Braun & Small); id. at 159:16-18 (Braun & Doering); Plaintiff's Exhibit 4, 15.

101.    Rey considered a fence for the property unnecessary because of the steep elevation and thick brush that acted as a natural barrier around the property.  See II Tr. at 7:17-8:5 (Gorence & Rey).

102.    Rey used his yurt for sleeping, cooking, reading, writing, playing music, and other activities when he was on the property.  See II Tr. at 12:11-13:12 (Gorence & Rey); Defendant's Exhibit J.

103.    Rey used the open area outside the yurt for activities such as barbeques, sleeping under the stars, quiet contemplation, having friends camp, playing music.  See II Tr. at 14:3-24 (Gorence & Rey).

## PROCEDURAL BACKGROUND

Rey moves the Court, pursuant to the Fourth Amendment to the United States Constitution and to rule 12(b)(3) of the Federal Rules of Criminal Procedure, to suppress evidence of alleged marijuana discovered on August 29, 2006 on Rey's Sandoval County property.  In his pre-hearing briefing, Rey argues that the officers conducted an illegal search of his property and seized alleged marijuana plants before obtaining a search warrant, and that the later search under a warrant does not cure the illegality of the initial search.  See Motion at 4-9.  He also contends that the affidavit supporting the warrant application omitted material information about the Rio Rancho officers' authority to operate in Sandoval County, in violation of the rule in Franks v. Delaware, 438 U.S. 154

-18-

(1978).  See Motion at 9-10.  Finally, he asserts that the United States cannot rely on the independent-source exception to the fruit of the poisonous tree doctrine.  See id. at 10-14.

In its written response, the United States first argues that the officers had probable cause before ever intruding upon any area in which Rey had a reasonable expectation of privacy because Dupre's aerial surveillance revealed marijuana and the officers' later walk along the power-line easement confirmed this observation.  See United States' Response to Defendant's Motion to Suppress Evidence at 3-4, filed April 24, 2009 (Doc. 117)("Response").  Next, the United States contends that exigent circumstances justified the pre-warrant security sweep of the property. See id. at 4-9.  The United States then contends that, even if the sweep or approach along the easement was in violation of the Fourth Amendment, the independent-source doctrine applies because of the later search warrant.  See Response at 9-10.  This warrant, the United States contends, was valid and, even if it was not valid, the evidence seized on Rey's property should not be suppressed under the good-faith exception from United States v. Leon, 468 U.S. 897 (1984). See Response at 10-14.

In reply, Rey argues that the officers' passage along the power-line easement was an illegal search.  See Reply Brief to the United States' Response to Defendant's Motion to Suppress Evidence at 1-4, filed May 12, 2009 (Doc. 120).  Rey also reiterates his contention that the officers' status to act in Sandoval County was material information that should have been conveyed to Judge Eichwald.  See id. at 4-5.  The United States has also filed a surreply, which argues that the officers' use of the power-line easement did not violate the Fourth Amendment.  See United States' Surreply Re: Defendant's Motion to Suppress Evidence at 1-5, filed June 3, 2009 (Doc. 124).

After the Court concluded the evidentiary hearing on the motion to suppress, the parties presented oral argument to the Court.  To begin, Robert Gorence, Rey's counsel, argued that, while

-19-

the aerial observation may have given rise to reasonable suspicion, it was not by itself enough for probable cause, as the officers' own actions in seeking confirmation demonstrated.  See II Tr. at 51:1-14 (Court & Gorence).  In response to the Court's question about how Rey could prevail if the helicopter view provided probable cause, Mr. Gorence contended that, regardless of the existence of probable cause, the officers' warrantless entry onto the easement was unlawful.  See id. at 55:18-56:12.  Mr. Gorence argued that use of the easement was limited to officials of the power company and did not create a general public right of way.  See id. at 57:8-18 (Gorence).

The Court also questioned whether it made sense to talk about curtilage in a forest.  Mr. Gorence maintained that the presence of the yurt, a residence, made the law of curtilage applicable to the situation.   See id. at 62:5-63:6 (Gorence).   Mr. Gorence contended that there were inconsistencies in the testimony regarding the timing of the helicopter's departure and Small's arrival.  Mr. Gorence argued that the officers had already entered the property once before Small arrived.  See id. at 69:3-71:16.  Mr. Gorence also contended that the protected sweep was illegally conducted without any exigent circumstances and that there was therefore independent grounds to suppress the evidence.  See id. at 72:17-73:8.

James Braun, the Assistant United States Attorney, argued that Dupre's aerial observation established probable cause, but that the officers did not immediately get a warrant because they wanted to learn more about the property.  See id. at 75:14-76:3 (Court & Braun).  Mr. Braun further argued that a warrant was likely not even necessary for the search here, because the yurt was not a residence and the surrounding property was not curtilage but wilderness subject to the open-fields doctrine.  See id. at 77:9-20.  Mr. Braun contended that the Dunn factors[8] supported the property not

---

[8] United States v. Dunn, 480 U.S. 294 (1987).

being curtilage, and that Rey's references to property law and trespass were inapposite in the Fourth Amendment context.  See id. at 78:8-81:9 (Braun & Court).  Mr. Braun argued that the exigent circumstances justified the protective sweep because of the possibility of the destruction of evidence or harm to the officers watching over the property while waiting for a warrant.  See id. at 82:11-84:12 (Court & Braun).  He maintained that, alternatively, the independent-source doctrine would apply even if the sweep was unlawful, because the officers had sufficient probable cause based upon the helicopter observations.  See id. at 84:22-85:1 (Braun).

Jason Bowles, co-counsel for Rey, argued that Dupre had an invalid commission, and that his observations could not support a search warrant because they were undertaken without jurisdiction.  See id. at 85:6-86:15 (Bowles).  In addition, Bowles argued that a problem with the commission should have been disclosed to Judge Eichwald.  See id. at 88:1-18.  Mr. Braun countered that Judge Eichwald had jurisdiction to issue that warrant, that the executing officer's jurisdiction was irrelevant, that the dispute over Dupre's status did not go to probable cause, and that the executing officer's jurisdiction was thus irrelevant information that need not have been disclosed to Judge Eichwald.  See II Tr. at 94:2-16 (Braun).

## RELEVANT FOURTH AMENDMENT LAW

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST., amend. IV.  It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  Id.  Evidence obtained in violation of the Fourth Amendment may be suppressed, but "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such

deterrence is worth the price paid by the justice system." Herring v. United States, 129 S.Ct. 695, 702 (2009). Thus, "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence," but "when police mistakes are the result of negligence . . . , rather than systemic error or reckless disregard of constitutional requirements," suppression is not automatic and "any marginal deterrence" from suppression is often insufficient. Id. at 702, 704.

### 1.     The Independent-Source Doctrine.

The exclusionary rule prohibits the introduction of evidence, both tangible and testimonial, that is seized or acquired during an unlawful search. See Murray v. United States, 487 U.S. 533, 536 (1988). "Under the fruit of the poisonous tree doctrine, the exclusionary rule bars the admission of physical evidence and live testimony obtained directly or indirectly through the exploitation of unconstitutional police conduct." United States v. Hatfield, 333 F.3d 1189, 1193-94 (10th Cir. 2003)(citing Wong Sun v. United States, 371 U.S. 471, 485-88 (1963)). If police "conduct[] unconstitutional searches that acquire[] information used to obtain [a] search warrant," then "evidence seized during the later search conducted pursuant to warrant would be inadmissible as fruit of the poisonous tree." Id. at 1194.

When determining whether evidence is fruit of the poisonous tree, a court is to consider whether the evidence was "come at by exploitation of [the initial] illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Seguara v. United States, 468 U.S. 796, 804-805 (1984)(internal quotations omitted)(alteration in original). Under the independent-source doctrine, evidence that is obtained based upon information unrelated to an unlawful search is not fruit of the poisonous tree. See Seguara v. United States, 468 U.S. at 799 (citing Silverthorne Lumber Co. v. United States, 251 U.S. 385 (1920)). Evidence therefore need not be excluded under

the fruits-of-the-poisonous-tree doctrine if there is an independent source for discovery of the challenged evidence. See id. at 805. Two Supreme Court cases have considered the operation of the independent-source doctrine in situations where a search warrant is obtained subsequent to an unlawful search.

In Seguara v. United States, police unlawfully entered an apartment and spotted drug-trafficking paraphernalia in plain view. See 468 U.S. at 801. A warrant was later obtained, based upon information that the police had known before the entry, and executed at the apartment. In the meantime, police stayed in the apartment to preserve the scene. Pursuant to the warrant, they later seized the paraphernalia, as well as cocaine, cash, ammunition, and records of drug transactions, none of which had been observed during the unlawful search. See id. Before the Supreme Court was the question whether the evidence that was not in plain view during the unlawful entry should be suppressed. See id. at 802 n. 4.

The Supreme Court held that, because the warrant was based on information obtained before the search, the evidence seized was from an independent source and was not fruit of the poisonous tree. See id. at 813-14. Thus, whether the entry and occupation of the apartment was unlawful was "irrelevant to the admissibility of the challenged evidence" because of the independent source. Id. at 813. Finding any connection between the unlawful entry and the seizure under the warrant to be sufficiently attenuated, the Supreme Court rejected the argument that the police occupation led to the seizure because the evidence might otherwise have been destroyed. See id. at 815-16.

Seguara v. United States was limited to situations where the challenged evidence was not in plain view during an unlawful search. Murray v. United States addressed this question that Seguara v. United States left open: whether the independent-source doctrine was available for evidence observed in plain view during an unlawful search. The Supreme Court held that the

doctrine also applied to evidence in plain view.

Murray v. United States dealt with a situation in which federal law enforcement obtained a warrant for a warehouse after illegally forcing entry to that warehouse.  Based upon tips from informants, federal agents began surveillance of several defendants.  See id. at 535.  Agents observed two of the defendants entering and then leaving a warehouse, one driving a camper and the other driving a truck.  See id.  When the defendants left the warehouse, the agents saw two individuals and a tractor-trailer rig with a long container inside.  See id.  The camper and truck were driven by several other drivers and ultimately the vehicles were lawfully stopped and found to contain marijuana.  See id.  After hearing of the marijuana in the vehicles, agents entered the warehouse and saw numerous burlap-wrapped bales in plain view.  See id.  The agents left and did not reenter the warehouse until later.  They obtained a warrant, without mentioning the entry or relying upon any observations from that entry, and seized the bales, which contained marijuana. See id.

The Supreme Court stated that "reseizure of tangible evidence already seized" could be allowed in the right circumstances.  Id. at 542.  "So long as a later, lawful seizure is genuinely independent of an earlier, tainted one . . . there is no reason why the independent source doctrine should not apply."  Id.  A source for a warrant would not be genuinely independent "if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant."  Id. (footnote omitted).  Although the district court had made factual findings that the unlawful entry was not revealed to the magistrate and that the agents did not rely on any observations from the entry in applying for a warrant, the record contained no findings on whether the agents would have sought a warrant absent the entry and so the Supreme Court ultimately

remanded for a determination in the district court regarding the independent-source doctrine's applicability.  See id. at 543-44.

"A source is genuinely independent if the government can show that the evidence was obtained by means sufficiently distinguishable to be purged of the primary taint."  United States v. Forbes, 528 F.3d 1273, 1278 (10th Cir. 2008)(internal quotations omitted).  "By contrast, a source is not independent if, granting establishment of the primary illegality, [the evidence has] been come at by the exploitation of the illegality."  Id. (internal quotations omitted, change in original).  To be an independent source, the source does not need to be temporally distinct from an unlawful search.  "It [i]s of no moment that [an illegal search and a lawful independent source] all occurred as part of one brief, uninterrupted sequence of events.  Rather, it [i]s enough that a genuinely independent source of the evidence" justify a search.  Id. at 1279.

In support of this principle, the Tenth Circuit approvingly discussed United States v. Moore, 329 F.3d 399 (5th Cir. 2003).  In that case, police allegedly unlawfully arrested a motorist and then conducted a canine search of the vehicle's exterior, leading to the discovery of drugs in the trunk.  See United States v. Forbes, 528 F.3d at 1279 (discussing United States v. Moore, 329 F.3d at 404-05).  Despite the closeness of the events, the United States Court of Appeals for the Fifth Circuit held that the canine search, which was legal in the circumstances regardless of the legality of the arrest, was an independent source and thus the drugs found in the trunk were not subject to suppression.  See United States v. Forbes, 528 F.3d at 1279 (discussing United States v. Moore, 329 F.3d at 404-05).  Following United States v. Moore, the Tenth Circuit held that, although officers may have unlawfully searched the trailer of a tractor-trailer rig, a near-simultaneous lawful canine search that revealed drugs in the cab of the rig was an independent source.  See United States v. Forbes, 528 F.3d at 1280.

2.    **Curtilage**.

"[T]he warrantless entry of the home is 'the chief evil against which . . . the Fourth Amendment is directed.'"  United States v. Lowe, 999 F.2d 448, 451 (10th Cir. 1993)(quoting United States v. United States District Court, 407 U.S. 297, 313 (1972)). This protection against warrantless searches extends to a home's curtilage.  See United States v. Dunn, 480 U.S. 294 (1987); Oliver v. United States, 466 U.S. 170 (1984).  Curtilage "is the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life, and therefore has been considered part of [the] home itself for Fourth Amendment purposes."  Oliver v. United States, 466 at 180 (internal quotation marks and citation omitted).

Areas that are not within the curtilage are considered "open field," and searches therein are not subject to the Fourth Amendment's reasonableness requirement.  United States v. Hatfield, 333 F.3d 1189, 1195-96 (10th Cir. 2003).  In other words, for Fourth Amendment purposes, no "search occurs if a police officer makes observations while in a public place or open field," even if the areas the officer views from that vantage point "lie within an area protected by the Fourth Amendment." Reeves v. Churchish, 484 F.3d 1244, 1254 (10th Cir. 2007).  The open-fields doctrine "may be understood as providing that an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home."  Oliver v. United States, 466 at 178.  Open fields include "any unoccupied or undeveloped area outside of the curtilage," and "need be neither 'open' nor a 'field' as those terms are used in common speech." Id. at 180 n.11.  Thus, "a thickly wooded area nonetheless may be an open field as that term is used in construing the Fourth Amendment."  Id.

Whereas open fields are areas that "do not provide the setting for those intimate activities that the [Fourth] Amendment is intended to shelter from government interference or surveillance,"

Oliver v. United States, 466 U.S. at 179, "the curtilage is the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life," id. at 180.  A two-step process is used to determine if an area is within the curtilage.  See United States v. Hatfield, 333 F.3d at 1195.  First, the court must determine if the property owner has exhibited a subjective expectation of privacy in the area searched.  See id.  If so, the court then looks to whether that expectation of privacy is one that society is prepared to recognize as reasonable.  See id.  In determining whether a given area is part of a home's curtilage, courts consider four factors:

(1)     the proximity of the area to the home;

(2)     whether the area is included within an enclosure surrounding the home;

(3)     the nature of the uses to which the area is put, specifically, whether the area is used for the intimate activities of the home; and

(4)     the steps taken by the resident to protect the area from observation.

Reeves v. Churchish, 484 F.3d at 1254-55 (citing United States v. Dunn, 480 U.S. 294, 301 (1987)). Courts are not to apply these factors mechanically, but rather treat them as "useful analytical tools" to aid the determination "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection."  United States v. Dunn, 480 U.S. at 301.  In effect, the curtilage encompasses those private areas outside the home that come under Fourth Amendment protection, while open fields are those areas outside the home not under Fourth Amendment protection.

In United States v. Hatfield, without explicitly applying the four factors delineated in United States v. Dunn, the United States Court of Appeals for the Tenth Circuit determined that a defendant's backyard where officers observed growing marijuana was within the curtilage.  See United States v. Hatfield, 333 F.3d at 1196.  The marijuana "was in a well-defined yard" that was

"standing close to the back of the house." Id.  The area where the marijuana was could not be seen from the street.  See id.  Ultimately, the Tenth Circuit found that the yard was "'so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection.'" Id. (quoting United States v. Dunn, 480 U.S. at 301).

In United States v. Cousins, 455 F.3d 1116, (10th Cir. 2006), the Tenth Circuit affirmed a district court's determination that a house's sideyard was outside the curtilage.  The Tenth Circuit noted that the sideyard was close to the house, enclosed on three sides, contained a melon garden, and was partially shielded from public view, all of which provided support to finding the sideyard to be curtilage.  See id. at 1122-24.  On the other hand, there was a paved walkway leading up to the yard through the unenclosed side, an electric meter in the yard, and the defendants knew that a meter reader visited the sideyard.  See id.  The Tenth Circuit found that these factors were sufficient for it to conclude that the sideyard was not within the house's curtilage.  See id. at 1124.

In Reeves v. Churchish, the Tenth Circuit held that the front yard of a duplex was not curtilage and was therefore open field, where the yard was in close proximity to the home, but no evidence existed that the yard was enclosed, was used for intimate activities of the home, or was in anyway protected from observation.  See 484 F.3d at 1254-55.  While curtilage cases have generally focused on urban areas or man-made enclosures, courts have held that natural enclosures such as pine trees satisfy the second Dunn factor.  In Hardesty v. Hamburg Township, 461 F.3d 646 (6th Cir. 2006), the United States Court of Appeals for the Sixth Circuit determined that it was not clear whether a yard was enclosed, because there was no fence around the property, but observed that there was "a line of pine trees along the back of the property and the sides of the property." Id. at 652.  Ultimately, the Sixth Circuit found that the mix of factors, which included the back deck specifically at issue being near to the home, a number of signs that the area was used for domestic

-28-

life, and the deck being at least partially shielded from view indicated that a back deck was curtilage. See id. at 652-53.  As United States v. Romano, 388 F.Supp. 101 (E.D. Pa. 1975), has noted: "The word curtilage is derived from the Latin cohors (a place enclosed around a yard) . . . . [U]sually it is enclosed some way by fence or shrubs."  Id. at 105 n.4 (emphasis added).

### 3.      Protective Sweeps and Exigent Circumstances.

One exception to the requirement that officers must have a warrant to search a person's home or its curtilage is the exception for protective sweeps.  Chimel v. California, 395 U.S. 752 (1969), held that officers could, as a search incident to arrest, search the area in a house around an arrestee, but could not range far beyond "the area from within which he might have obtained either a weapon or something that could have been used as evidence against him."  Id. at 768.  The Supreme Court expanded this principle in Michigan v. Long, 463 U.S. 1032 (1983), which held that a "search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons."  Id. at 1049 (internal quotation marks omitted). And in Maryland v. Buie, 494 U.S. 325 (1990), the Supreme Court recognized protective sweeps as an exception to the warrant requirement.  The Supreme Court defined a protective sweep as "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others.  It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding."  Id. at 327.  The Supreme Court held that such sweeps were constitutional if the officer "'possesse[d] a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed]' the officer in believing that the area swept

-29-

harbored an individual posing a danger to the officer or others." Id. (quoting Michigan v. Long, 463 U.S. at 1049)(alterations in Maryland v. Buie, citations and further quotation marks omitted).

The Tenth Circuit "has interpreted *Buie* to mean that a protective sweep may be conducted only if incident to arrest." United States v. Freeman, 479 F.3d 743, 750 (10th Cir. 2007)(citing United States v. Walker, 474 F.3d 1249, 1254 (10th Cir. 2007), and United States v. Davis, 290 F.3d 1239, 1242 n. 4 (10th Cir. 2002)).   Acknowledging that other circuits have taken a different approach, the Tenth Circuit nonetheless stated that it was bound by the precedent from United States v. Davis.   See United States v. Freeman, 479 F.3d at 750.   Since United States v. Freeman was decided, the Tenth Circuit has not overruled United States v. Davis and continues to note that the Tenth Circuit follows the minority rule, which requires that a protective sweep be conducted incident to arrest.   See United States v. Jimenez, 2009 WL 1927370 at *4 (10th Cir. 2009).

Related to the protective sweep is the doctrine of exigent circumstances.   A warrantless search is not unconstitutional if the search was conducted under exigent circumstances.   "Exigent circumstances may justify a search where '(1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of . . .  others, and (2) the manner and scope of the search is reasonable.'"   United States v. Gambino-Zavala, 539 F.3d 1221, 1225 (10th Cir. 2008)(quoting United States v. Najar, 451 F.3d 710, 718 (10th Cir. 2006))(omission in United States v. Gambino-Zavala).   Those cases upholding sweeps conducted under the exigent-circumstances doctrine have "involved Fourth Amendment intrusions justified by a threat to a civilian's safety."   United States v. Walker, 474 F.3d 1249, 1254 (10th Cir. 2007).   Accordingly, "absent clarification from an en banc court," the Tenth Circuit has refrained from justifying a "sweep by applying the exigent-circumstances exception based on officer safety."   Id.

Earlier cases from the Tenth Circuit have defined exigent circumstances as arising when

> (1) the law enforcement officers . . . have reasonable grounds to believe that there is
> immediate need to protect their lives or others or their property or that of others, (2)
> the search [is not] motivated by an intent to arrest and seize evidence, and (3) there
> [is] some reasonable basis, approaching probable cause, to associate an emergency
> with the area or place to be searched.

United States v. Anderson, 981 F.2d 1560, 1567 (10th Cir. 1992)(quoting United States v. Smith,

797 F.2d 836, 840 (10th Cir. 1986)).  Imminent destruction of evidence may also provide exigent

circumstances.

> An exception to the warrant requirement that allows police fearing the destruction
> of evidence to enter the home of an unknown suspect should be (1) pursuant to clear
> evidence of probable cause, (2) available only for serious crimes and in
> circumstances where the destruction of the evidence is likely, (3) limited in scope to
> the minimum intrusion necessary to prevent the destruction of evidence, and (4)
> supported by clearly defined indicators of exigency that are not subject to police
> manipulation or abuse.

United States v. Aquino, 836 F.2d 1268, 1272 (10th Cir. 1988).

### 4.    **Falsehoods or Omissions in a Warrant Affidavit**.

Defendants have a limited right to challenge in their criminal proceedings the truthfulness

of statements made in an affidavit supporting an ex parte application for a search warrant.  See

Franks v. Delaware, 438 U.S. at 155-56.  As the Supreme Court has stated:

> [W]here the defendant makes a substantial preliminary showing that a false
> statement knowingly and intentionally, or with reckless disregard for the truth, was
> included by the affiant in the warrant affidavit, and if the allegedly false statement
> is necessary to the finding of probable cause, the Fourth Amendment requires that
> a hearing be held at the defendant's request. In the event that at that hearing the
> allegation of perjury or reckless disregard is established by the defendant by a
> preponderance of the evidence, and, with the affidavit's false material set to one side,
> the affidavit's remaining content is insufficient to establish probable cause, the
> search warrant must be voided and the fruits of the search excluded to the same
> extent as if probable cause was lacking on the face of the affidavit.

Franks v. Delaware, 438 U.S. at 155-56.  Franks v. Delaware's standards apply to material omissions

as well as to affirmative falsehoods.  See United States v. Avery, 295 F.3d 1158, 1166 (10th Cir.

2002)(citing United States v. McKissick, 204 F.3d 1282, 1297 (10th Cir. 2000)).

"If, however, the district court concludes that the omitted information would not have altered the magistrate judge's decision to authorize the search, then the fruits of the challenged search need not be suppressed." United States v. Avery, 295 F.3d at 1167. "In a case where the defendant alleges information was intentionally omitted from an affidavit, the existence of probable cause is determined by examining the affidavit as if the omitted information had been included and determining whether the affidavit would still give rise to probable cause." United States v. Basham, 268 F.3d 1199, 1204 (10th Cir. 2001). Thus, the Tenth Circuit has held that, even if an officer "intentionally withheld information that the media would be present during the execution of the warrant," and did not tell the issuing magistrate judge that officers were "planning a high-risk execution of the warrant at a time when there would be minor children in the home," there was no material omission because such facts about the method of executing the warrant were not relevant to probable cause. Id.

**5.      Authority to Execute a Search Warrant.**

In United States v. Green, 178 F.3d 1099 (10th Cir. 1999), the Tenth Circuit confronted the intersection of Fourth Amendment law and state law regarding police jurisdiction. It was undisputed that the officers executing the warrant were acting outside their jurisdiction under Kansas law. See id. at 1105. The Tenth Circuit observed that it was

> "well established in this circuit that 'in federal prosecutions the test of reasonableness in relation to the Fourth Amendment protected rights must be determined by Federal law even though the police actions are those of state police officers.'" *United States v. Le*, 173 F.3d 1258, 1264 (10th Cir. 1999) (quoting *United States v. Miller*, 452 F.2d 731, 733 (10th Cir. 1971)). This is because " 'the exclusionary rule is only concerned with deterring [federal] Constitutional violations.'" *Id.* (quoting *United States v. Wright*, 16 F.3d 1429, 1437 (6th Cir. 1994)). Thus, "the fact that the arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under the Federal Constitution were

not offended." *Id.* (citation omitted).

United States v. Green, 178 F.3d at 1105.

Attempting to distinguish Tenth Circuit precedent, the defendant in United States v. Green argued that, when state officers conducted a seizure outside their jurisdiction, there was a Fourth Amendment violation, analogous to a warrantless arrest without jurisdiction being unlawful.  See United States v. Green, 178 F.3d at 1106 (citing Ross v. Neff, 905 F.2d 1349 (10th Cir. 1990)).  The Tenth Circuit rejected this line of reasoning, and held that, when a search is conducted pursuant to a warrant, the warrant  is valid so long as it meets the normal constitutional standards -- "'probable cause supported by an oath or affirmation and a particular description of the place, persons and things to be searched and seized.'"  United States v. Green, 178 F.3d at 1106 (quoting United States v. Wicks, 995 F.2d 964, 972 (10th Cir. 1993)).  Because any lack of state jurisdiction by the executing officers or other state-law violation was irrelevant to the inquiry, and the warrant was supported by probable cause, the Tenth Circuit held that the search pursuant to the warrant was lawful.  See United States v. Green, 178 F.3d at 1106.

## ANALYSIS

Rey's motion presents a number of issues.  While he does not challenge the constitutionality of the helicopter surveillance that initiated the chain of events at issue here, he contends that the surveillance did not establish probable cause.  On the other hand, Rey challenges that the officers' observations from the power-line search was unlawful.  The Court disagrees with Rey on both points.  The area along the power line was not curtilage and so the officers' walking along that area and their observations from that area were lawful.  Combined with the aerial observations, the viewing of marijuana plants from by the power lines was sufficient to establish probable cause.  Even without the observations from the power lines, however, the aerial surveillance was sufficient

to establish probable cause.

The information gained from the helicopter and easement searches is the only information used to support probable cause in the affidavit for the search warrant.  With both searches being lawful, the warrant and the search and seizure conducted under the warrant would normally be lawful as well.  Rey also contends, however, that the security sweep was unlawful and requires suppression of the marijuana as fruit of the poisonous tree.  The United States first defends the search on the grounds that exigent circumstances justified it.  The Court harbors doubts about this line of argument, but agrees with the United States' alternative theory -- that the independent-source doctrine applies, because the officers had probable cause before the sweep.  Rey's last challenge is that the warrant is void under Franks v. Delaware because Doering did not divulge to Judge Eichwald that he lacked jurisdiction to operate in Sandoval County, or that, at a minimum, he failed to reveal that his jurisdiction was in dispute.  Because an officers' jurisdiction under state law is irrelevant to determining whether there has been a federal Fourth Amendment violation in executing a search warrant and has nothing to do with probable cause, the Court does not consider the omission to be a Franks violation.  In sum, the search and seizure of marijuana from Rey's property complied with the Fourth Amendment's requirements, and the Court will not suppress any evidence the officers seized pursuant to the warrant.

## I.    DUPRE HAD PROBABLE CAUSE TO BELIEVE THAT MARIJUANA WAS BEING GROWN ON THE SITE FROM THE AERIAL OBSERVATION.

At the outset, while Rey does not contend that Dupre's aerial observations violated his constitutional rights, the parties are at odds over whether Dupre's observations from the helicopter flyovers were sufficient to develop probable cause.  Rey contends that Dupre only had a hunch that there was marijuana growing on the property.  Disagreeing, the United States maintains that Dupre

was confident he had spotted marijuana and that the ground team was only confirming what Dupre had already established.  Resolution of this dispute is to some extent unnecessary, because the Court concludes that the observations from the power line are lawful, but the Court agrees that the United States has the better of this argument.

Probable cause is "defined as a 'fair probability' that contraband or other evidence will be found in a particular place."  United States v. Biglow, 562 F.3d 1272, 1281 (10th Cir. 2009)(quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).  "One of the Supreme Court's 'central teaching[s]' on the Fourth Amendment is that probable cause is a 'practical, nontechnical conception,' designed to operate in conjunction with the 'commonsense,' 'practical considerations of everyday life,' rather than the elaborate rules employed by 'legal technicians.'"  United States v. Biglow, 562 F.3d at 1281 (quoting Illinois v. Gates, 462 U.S. at 230-31)(alteration in United States v. Biglow).  "Probable cause 'requires only a probability or substantial chance of criminal activity,' rather than 'an actual showing of such activity.'"  United States v. Biglow, 562 F.3d at 1281 (quoting New York v. P.J. Video, Inc., 475 U.S. 868, 877-78 (1986)).

Rey primarily contends that Dupre was uncertain whether he had spotted marijuana.  Dupre was not a novice spotter.  He had prior experience in spotting marijuana from a helicopter in eradication missions in which he had participated while working in Washington state.  See I Tr. at 14:1-6, 14:9-15 (Dupre).  While flying about five-hundred feet above ground, he caught sight of what, based upon his training and experience, he was thought was marijuana.  See I Tr. at 18:17-25, 19:11-13, 19:19-22, 67:17-23 (Dupre & Braun).  The helicopter then flew down for a closer look, to about a hundred feet up, and became "pretty positive" that the plants we saw were marijuana plants.  I Tr. at 19:1-3(Dupre).  While Dupre admitted that he could not say without a doubt that the plants were marijuana without verification from the ground,   see I Tr. at 40:1-10 (Gorence &

Dupre), Dupre's observations need only show a "fair probability" that the plants were marijuana to establish probable cause, Illinois v. Gates, 462 U.S. at 238.  And while the area he was viewing was forested, which might obscure his vision, one of the features which stood out to Dupre was how the marijuana plants' color contrasted with the surrounding vegetation.  See I Tr. at 18:21-23, 19:16-18 (Braun & Dupre).  The Court believes that Dupre gained sufficient information from his aerial surveillance to establish probable cause.

Rey criticizes the search warrant affidavit for saying only that the "plants had a unique color indicative of growing marijuana, which stands out from other vegetation in the area, based on his training and experience," which he contends is insufficient.  Search Warrant Affidavit at 3.  The affidavit also states that Dupre "observed growing marijuana."  Id.  The later description provides additional information, focusing on the coloration that struck Dupre as particularly noteworthy, but the affidavit does not convey that Dupre saw color indicative of marijuana and nothing else.  Instead, the affidavit states that Dupre saw marijuana and that the color was one of the reasons why he believed he had seen marijuana.  Rey also points out that the warrant notes that Dupre was a "certified spotter," id., which, Rey notes, is apparently based upon his completion of a course focused on helicopter safety and not on the techniques of aerial surveillance, see I Tr. at 31:19-32:15 (Gorence & Dupre).  Dupre was certified as a spotter, however, see I Tr. at 14:22-15:1 (Dupre), and to the extent that the phrase might be construed as misleading, Dupre was an experienced spotter regardless, so the Court does not see it as having any real effect.

Rey also argues that the officers' decision to confirm Dupre's observation with on-the-ground viewing of the property shows that the view from the helicopter was insufficient to establish probable cause.  Deciding to seek more evidence before getting a warrant, however, does not strike the Court as being unusual.  Even if police have enough information for probable cause, they may

decide to gather more information, either to assure themselves a crime is being committed -- probable cause is a relatively low standard after all and nothing prevents police from being more rigorous -- or to be prepared in case a magistrate proves unusually skeptical.  Ultimately, the state must prove the crime occurred, and who did it, beyond a reasonable doubt.  The Court does not see the decision to obtain more information as casting doubt on Dupre's observations.

The thrust of Rey's argument seems to be aimed more at whether Dupre was sure of his assessment from the air, rather than at whether such observations could, even if made confidently, establish probable cause.  Nonetheless, the Court notes that an observation from a helicopter being sufficient for probable cause is consistent with case law.  Most cases, including those from the Tenth Circuit, involve an aerial observation plus some other factor contributing to probable cause, and do not consider whether aerial observations standing alone will support probable cause.  See United States v. Allerheiligen, 221 F.3d 1353 (Table) at *7 (10th Cir. 2000)("The agents' observations during the walk-in, coupled with those made by Agent Christy during the fly-over, clearly support the magistrate's finding of probable cause to search Mr. Allerheiligen's residence."); United States v. Wilson, 156 F.3d 1245 (Table) at *3 (10th Cir. 1998)("The affiant's statement that during an aerial flyover he viewed marijuana plants on land where Defendant resided and the other statements in the affidavit that Defendant exhibited behavior consistent with those involved in the production of marijuana established a fair probability that a crime was being committed and support a finding of probable cause.").  No cases from the Tenth Circuit, however, have concluded that such observations are by themselves insufficient.  And cases from other circuits have found that an officer's observations from the air can provide enough evidence for a finding of probable cause.  See United States v. Fuesting, 845 F.2d 664, 671 (7th Cir. 1988)(finding no error in district court's conclusion that aerial observations of growing marijuana established probable cause).  Given the

-37-

relatively low threshold showing needed to establish probable cause -- "only a probability or substantial chance of criminal activity,' rather than 'an actual showing of such activity,'" United States v. Biglow, 562 F.3d at 1281 (quoting New York v. P.J. Video, Inc., 475 U.S. at 877-78) -- the Court believes that Dupre's observations were enough to show probable cause.  Here, however, as in most cases involving helicopters observing marijuana growing outside, there was also additional evidence to support probable cause -- the observations from the power-line easement.

## II.   THE OFFICERS DID NOT PERFORM AN UNLAWFUL SEARCH BY WALKING ALONG THE POWER LINE.

In addition to Dupre's observations from the helicopter, the affidavit in support of the search warrant relied on the officers' observations from the ground.  Rey does not argue, nor could he reasonably do so, that the combination of the two observations is insufficient to establish probable cause.  Instead, the question is whether the officers' walking along the power-line easement or right of way was an unlawful search.  If it was an unlawful search, then the information obtained in that search cannot be used to support the later search warrant.  See United States v. Hatfield, 333 F.3d at 1194 (holding that, if police "conduct[] unconstitutional searches that acquire[] information used to obtain [a] search warrant," then "evidence seized during the later search conducted pursuant to warrant would be inadmissible as fruit of the poisonous tree"); Wong Sun v. United States, 371 U.S. at 485-88.  This issue turns upon whether the power-line easement was curtilage subject to Fourth Amendment protection.  Applying the Dunn factors, the Court concludes that the officers were traversing an open field when they passed along the easement, and thus their observations from that vantage were lawful and may be used to support the warrant.

While warrantless intrusions into the home are "the chief evil against which . . . the Fourth Amendment is directed,'" United States v. Lowe, 999 F.2d at 451 (quoting United States v. United

States District Court, 407 U.S. at 313), areas outside the home are on less firm Fourth Amendment

footing.  Certain areas around a home may be curtilage, which "is the area to which extends the

intimate activity associated with the sanctity of a man's home and the privacies of life, and therefore

has been considered part of [the] home itself for Fourth Amendment purposes."  Oliver v. United

States, 466 at 180 (internal quotation marks and citation omitted).  Areas that are not within the

curtilage, however, are considered "open field" and are outside the Fourth Amendment.  United

States v. Hatfield, 333 F.3d at 1195-96.  There are four factors that the Court must apply to

determine whether the power-line easement here is curtilage:

> (1)   the proximity of the area to the home;
>
> (2)   whether the area is included within an enclosure surrounding the home;
>
> (3)   the nature of the uses to which the area is put, specifically, whether the area is used for the intimate activities of the home; and
>
> (4)   the steps taken by the resident to protect the area from observation.

Reeves v. Churchish, 484 F.3d at 1254-55 (citing United States v. Dunn, 480 U.S. at 301).  These

factors are not rigid factors, but "useful analytical tools" to aid the determination "whether the area

in question is so intimately tied to the home itself that it should be placed under the home's

'umbrella' of Fourth Amendment protection."  United States v. Dunn, 480 U.S. at 301.  Rey has the

burden of showing that the easement is within the curtilage.  See United States v. Cavely, 318 F.3d

987, 994 (10th Cir. 2003)("The courts have consistently held that the burden of establishing a

legitimate expectation of privacy is on the party claiming a Fourth Amendment violation, . . . and

we have applied that same rule to a claimed invasion of the curtilage.")(citing Fullbright v. United

States, 392 F.2d 432, 435-36 (10th Cir. 1968)).

     Proximity to the home, the first factor, favors finding the easement to be outside the

curtilage.  For this analysis, the Court assumes, without deciding, that the yurt qualifies as a home subject to Fourth Amendment protection and capable of extending its protection to the surrounding curtilage.  Even treating the yurt as a home, however, it is rather far from the easement.  The yurt is located about one-hundred feet away from the section of the power line from which the officers saw marijuana growing and even further away from the officers' entry point onto the easement at the drive.  See Plaintiff's Exhibit 6, 16; II Tr. at 19:17-20:1 (Gorence & Rey).

Those cases finding a particular area to be curtilage, or at least finding proximity, have almost inevitably involved an area abutting the home.  See, e.g., United States v. Hatfield, 333 F.3d at 1196 (finding proximity where yard was "standing close to the back of the house"); United States v. Cousins, 455 F.3d at 1122-24 (finding sideyard close to home to be in proximity to home, although ultimately not finding it to be curtilage).  Here, the easement and the area surrounding it are not close to the yurt.  Thus, the first factor weighs against the power-line easement being part of the curtilage.

The second factor, whether the area is included in an enclosure surrounding the home, also tends to favor the area not being curtilage.  Access to the power-line easement does not require crossing any fences or walking by any signs.  See Plaintiff's Exhibit 4, 15; I Tr. at 81:14-18 (Small & Braun); id. at 159:16-18 (Braun & Doering).  While Rey blocked off the drive with a chain, the entrance to the easement is before the chain.  See Plaintiff's Exhibit 15; I Tr. at 80:13-81:2 (Small & Braun); id. at 158:13-159:7 (Braun & Doering).  Natural features can enclose an area.  See, e.g., Hardesty v. Hamburg Township, 461 F.3d at 652.  It is notable, here, however, that, while the officers had to push through foliage to gain access to the easement, see I Tr. at 77:23-78:8 (Small), that foliage was growing wild and was not, for example, a planted line of trees or a hedgerow that would make walking onto the easement impossible, see Hardesty v. Hamburg Township, 461 F.3d

at 652; United States v. Romano, 388 F.Supp at 105 n.4.  Forests can be "open fields" the same as fields can.  Oliver v. United States, 466 U.S. at 180 n.11.  Here, with no fence or other man-made obstacle in the way, and with the chain and no-trespassing signs further up the drive, the officers were essentially entering into woods the same as any other woods around or on a person's property, and such woods are open fields.  See id.  Indeed, the power-line easement, while not cleared of foliage and easily traversable, nonetheless provided something of a trail, which indicates less of an enclosure than a natural forest would otherwise normally indicate.  See United States v. Cousins, 455 F.3d at 1123 (finding that expected path into area not being enclosed supported area not being curtilage).

The third factor, the nature of the uses to which the area was put, favors it not being curtilage.  Further onto Rey's property, there are arguably indications that those parts of the property closer to the yurt were used for intimate activities associated with the home, such as cooking on a firepit.  See II Tr. at 15:5-10 (Rey); Plaintiff's Exhibit 16.  Along the power-line easement, however, there are no such signs -- the area contains only the power lines themselves and vegetation.  See Plaintiff's Exhibit 5, 14.  Indeed, it is unsurprising that the area along a power-line easement is without any trace of activities associated with the home.  Most people probably do not want to spend a lot of their time outdoors sitting under a power line.  A power line is an artificial construction and thus a sign of human presence, but it is not a an indication that "the area is used for the intimate activities of the home."  Reeves v. Churchish, 484 F.3d at 1254.  Rather, the power line tends to show the opposite: that the area is not part of the intimate space associated with home, similar to the electric meter in the sideyard in United States v. Cousins.  See 455 F.3d at 1123.

Finally, the steps Rey took to protect the area from observation, the fourth factor, also tilts towards finding the area beyond the curtilage.  In this case, the relevant facts for this factor overlap

-41-

those for the second factor.  While Rey blocked off the drive with a chain and posted no-trespassing

signs to either side of the chain, those features all are further up the drive from the power lines.  See

Plaintiff's Exhibit 15; I Tr. at 80:13-81:2 (Small & Braun); id. at 158:13-159:7 (Braun & Doering).

Rey stated that he had posted a sign closer to the base of the drive, see II Tr. at 5:23-25 (Rey), but

that sign is no longer there, and, as the Court has determined, it was not present at the time of the

search, see I Tr. at 81:14-18 (Braun & Small); id. at 159:16-18 (Braun & Doering); Plaintiff's

Exhibit 4, 15.  There are mailboxes at the base of the drive, along the highway, but typically one

would expect mailboxes in a rural area to be along the highway and there are, moreover, a large

number of mailboxes at the base of the drive and not just Rey's mailbox.  See Plaintiff's Exhibit 3.

There are no signs or obstacles to access until further up the drive; the side of the drive on which

the officers walked rises somewhat steeply from the highway and is wooded, but there is no fence

or sign to indicate that the area immediately off the highway is being made private.  See Plaintiff's

Exhibit 3; I Tr. at 81:14-18 (Braun & Small); id. at 159:16-18 (Braun & Doering).  In sum, a person

could, as the officers did, walk up the broad drive from the highway and then turn off through some

underbrush onto the power-line easement without ever coming across any definite indication that

someone owned that particular portion of land and was intent on making it private.

All the Dunn factors thus favor, to greater or lesser degrees, the power-line easement not

being curtilage.  No single factor is dispositive, but on the facts here, the Court does not see any

sound basis for concluding that the easement is within the curtilage.  The easement through the trees

is not an area "so intimately tied to the home itself that it should be placed under the home's

'umbrella' of Fourth Amendment protection."  United States v. Dunn, 480 U.S. at 301.

To attempt to undercut the directions the Dunn factors point and to show that the officers'

entry onto the easement violated the Fourth Amendment, Rey makes a pair of related arguments.

He first contends that the easement or right of way was for the benefit of PNM employees, but was not available to the general public or law enforcement.  This argument largely misses the point.  "The existence of a property right is but one element in determining whether expectations of privacy are legitimate."  Oliver v. United States, 466 U.S. at 183.  The Supreme Court has held that police may enter open fields without conducting "a 'search' in the constitutional sense" despite the intrusion being "trespass at common law."  Id.

Determining whether an area is curtilage is involves determining whether that area is entitled to Fourth Amendment protection because it is sufficiently connected with the home.  That the police's presence in the area is trespass is a given, otherwise there would be no need to determine whether the area was curtilage or open fields, because the police would be lawfully present on non-private land.  The Supreme Court has determined, in Oliver v. United States, that police may trespass onto land without offending the Fourth Amendment so long as the land in question in not part of the curtilage.  See 466 U.S. at 183-84.  The Supreme Court considered, and rejected, the argument that, in particular circumstances, open fields might enjoy a reasonable expectation of privacy under the Fourth Amendment.  See 466 U.S. at 180-81.  Thus, the question is whether a given area is curtilage, and Rey's trespass argument does not aid him in having the Court answer that question in his favor.

If the United States was relying on the legal existence of an easement, his argument would have more force.  For example, if the land was clearly curtilage and the United States were pointing to the easement as an exception to the warrant requirement, perhaps under a theory of implied consent or something similar, then the existence and scope of the easement might be relevant.  Here, however, the United States can rely on the Dunn factors.  In contrast with a legal easement, those factors focus on external indicia that ultimately determine whether a particular area outdoors should

-43-

be treated as part of the home.  Even if there were no legal easement benefitting anyone, the Court's analysis would not change.  The area along the power line would still not be curtilage and thus the officers' march along it was not an unconstitutional search.

In a related vein, Rey attempts to distinguish this situation from United States v. Cousins. In particular, he argues that, in United States v. Cousins, a PNM employee who had gone to the electric meter at the house had alerted police to the presence of marijuana.  Rey is correct that this particular background fact in United States v. Cousins is different than the facts here.  That difference, however, is not a legally important one.  While police were alerted to marijuana because of a PNM employee's observations, the question in United States v. Cousins was whether the sideyard was curtilage and thus whether the police officers' entering the sideyard was a warrantless search of the home.  See id. at 1121-24.  The PNM employee's observations, which triggered the search, was of only marginal importance to this question.  This fact was only important to the extent that it helped show that the homeowners knew that the area with the electric meter was visited by PNM employees, which undercut the sideyard being curtilage.  See id. at 1123.  The ultimate question remained, however, whether the sideyard was curtilage and thus whether police could enter it without a warrant.  In the end, the Court concludes that the easement was not curtilage and that the officers could lawfully view marijuana growing on Rey's property from that easement, and finds Rey's arguments to the contrary unpersuasive.

## III.   THE INDEPENDENT-SOURCE DOCTRINE IS APPLICABLE REGARDLESS WHETHER THE SECURITY SWEEP WAS UNLAWFUL.

After viewing marijuana growing on the property from the easement, the officers proceeded to conduct a security sweep of the property that involved the officers looking into the tent near the easement, wandering around much of Rey's property and entering the yurt.  Rey contends that this

-44-

sweep was unlawful and that the Court must therefore suppress the marijuana found on the property as fruit of the poisonous tree. While the Court has its doubts about the United States' arguments that the sweep was justified, the Court nonetheless concludes that the independent-source doctrine applies, and so the marijuana was properly seized under the search warrant regardless of the sweep's legitimacy.

Under Murray v. United States, regardless whether the officers' leaving the power-line area and proceeding deeper onto Rey's property and eventually into the yurt was lawful, the independent-source doctrine applies here. Once the officers were on the easement looking at marijuana growing among the trees, they had developed enough probable cause for a warrant. Because they had thus gathered the evidence for probable cause independent of any potentially unlawful search, and because the only evidence presented to Judge Eichwald to obtain a warrant was this independent evidence, the Court will not suppress the evidence seized under the warrant as fruit of the poisonous tree.

In the course of the sweep, the officers covered much of Rey's property and searched his yurt. The United States contends that exigent circumstances, in the form of preserving evidence or ensuring officer safety, were present.[9] Exigent circumstances to preserve evidence, an exception to the warrant requirement, must be:

> (1) pursuant to clear evidence of probable cause, (2) available only for serious crimes and in circumstances where the destruction of the evidence is likely, (3) limited in scope to the minimum intrusion necessary to prevent the destruction of evidence, and (4) supported by clearly defined indicators of exigency that are not subject to police manipulation or abuse.

---

[9] In justifying the sweep, the United States focuses on exigent circumstances rather than arguing that all or some of the area around the yurt was open fields. The Court need not decide whether any part of Rey's property other than the easement was curtilage.

United States v. Aquino, 836 F.2d at 1272.  The Court is somewhat skeptical that the United States could show the destruction of evidence was likely here or that there were clear indicators of exigency.  The officers seemed to be acting to confirm that there was no possibility that evidence would be destroyed, rather than having any particular reason to believe that destruction was likely without a search.  Similar concerns seem to have motivated the officers to search for persons who might be on the property to ensure their own safety.  To justify such a search, however, there must be an "an objectively reasonable basis to believe there is an immediate need" for the search to protect life.  United States v. Najar, 451 F.3d at 718.  Again, the Court is skeptical that this rigorous standard could be met here.  Moreover, while earlier case law states that the need to protect officer safety can create exigent circumstances, see United States v. Anderson, 981 F.2d at 1567 (1992), more recently, the Tenth Circuit has observed that exigent-circumstances cases have "involved Fourth Amendment intrusions justified by a threat to a civilian's safety," and has therefore refrained from justifying a "sweep by applying the exigent-circumstances exception based on officer safety," United States v. Walker, 474 F.3d at 1254 (2007).  For these reasons, the Court has doubts whether the security sweep could be justified here.[10]  The Court need not decide that issue, however, because regardless of the lawfulness of the sweep, the independent-source doctrine protects the evidence that was seized pursuant to the warrant.

The affidavit describes the evidence from the ground as:

Office Dupre contacted Affiant, who was acting as ground support for the operation and directed him to the location of the suspected marijuana.  Affiant and other Officers/Agents, approached the location along the power line right of way.  Affiant

---

[10] Though not raised in the briefing, at the hearing, the United States questioned whether the yurt was even a home at all for Fourth Amendment purposes.  If the yurt was not a home, then neither it nor the property around it could be curtilage.  Whether the yurt is a home or not raises an interesting question -- which was not briefed -- but the Court need not decide that issue.

observed numerous plants consistent with marijuana in his training and experience
in plain view.  Affiant and other officers entered the property to perform a security
sweep and found no person(s) on the property.

Affidavit for Search Warrant at 3.  Thus, the information revealed to Judge Eichwald in support of

there being probable cause was limited to the information that officers gleaned while along the

power-line easement, which the Court has found is lawful.  The affidavit states that the officers

approached along the power line and then saw the marijuana plants in plain view.  This description

is consistent with the officers' testimony about what they saw from the power line.  The affidavit

distinguishes the security sweep, which is disclosed, from the observations along the power line, and

no evidentiary information is mentioned pursuant to the security sweep other than the lack of

persons being present, which is not relevant to probable cause.  Thus, Judge Eichwald was informed

only about the facts obtained from the helicopter flyover and from the view from the power-line

easement.

This conclusion means that the later security sweep, lawful or not, cannot invalidate the

warrant.  The Supreme Court has held that, when evidence is seized under a warrant based upon an

independent source of probable cause, that evidence should not be suppressed as fruit of the

poisonous tree even if it was seen in plain view during an unlawful search.  Murray v. United States

controls the outcome of the case here.

In Murray v. United States, federal agents had developed probable cause that a warehouse

contained drugs.  Soon after seizing two vehicles carrying drugs that had left the warehouse, agents

entered the warehouse without a warrant and saw a number of bales in plain view.  See 487 U.S. at

535.  Without basing their warrant application on the entry to the warehouse, which was presumably

unlawful, the agents obtained a warrant and seized bales of marijuana from the warehouse.  See id.

The Supreme Court held that the evidence did not need to be suppressed, even if it been seized

before the warrant was executed when the agents entered the warehouse, "[s]o long as [the] later, lawful seizure [wa]s genuinely independent of an earlier, tainted one." Id. at 542. The Supreme Court outlined what needed to be shown to demonstrate genuine independence in that case: a source for a warrant would not be genuinely independent "if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." Id. (footnote omitted). Because there was insufficient information regarding the agents' decision to seek the warrant, the Supreme Court remanded for further factual findings. See id. at 543-44.

This case is analogous to Murray v. United States. Like the agents in Murray v. United States, the officers here had developed probable cause before they embarked on a potentially unlawful security sweep of Rey's property. Even though the officers unquestionably observed more marijuana during that sweep, and even if they can be deemed to have effectively seized that marijuana, Murray v. United States teaches that this potential taint does not necessarily extend to a later, warrant-based seizure. The question then is whether the officers' "decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to [Judge Eichwald] and affected his decision to issue the warrant." Id. (footnote omitted).

On the first point, the Court believes that the evidence shows that the security sweep was not the impetus for the warrant. Legally justifiable or not, the officers wanted to make a sweep of the property to ensure their safety and that no one could destroy evidence, and not to find evidence or determine whether a search warrant was needed. See I Tr. at 89:13-90:14, 91:2-7(Braun & Small); id. at 161:7-16 (Braun & Doering). The Court does not see any contrary evidence indicating that the sweep led to the decision to get a warrant.

-48-

Regarding the second point, as the Court has already noted, the affidavit shows that the only information presented to Judge Eichwald to support probable cause was Dupre's observations from the helicopter and the officers' observations from the power-line easement. The warrant application was not based upon any information obtained during the sweep. While the affidavit has one sentence mentioning the sweep, that sentence does not discuss any facts that would be relevant to probable cause. The sentence only states that the sweep took place and that no one was present. These facts are irrelevant to probable cause and would not have affected Judge Eichwald's decision to issue a warrant. Although Rey pressed Doering on why he would not disclose forcing entry into the yurt to Judge Eichwald, Doering's actions actually help rather than hinder the case for the independent-source doctrine applying. See I Tr. at at 219:10-220:2 (Gorence & Doering).[11]  And while the affidavit uses the word yurt, which the officers would not have used without having seen the tag on the yurt, the Court does not see that fact as having any consequence for Judge Eichwald's probable-cause determination.

Accordingly, the warrant and Judge Eichwald's determination of probable cause was based upon a genuinely independent source of information. While this conclusion is based upon the specific tests described in Murray v. United States that control here, it is also evidence under the general understanding of the independent-source doctrine. A source is not independent if evidence is obtained because of the exploitation of an illegal search. See United States v. Forbes, 528 F.3d at 1278. If the officers had walked down the power-line path, saw the marijuana plants, they could have turned back immediately and got a warrant. Put differently, if the potentially unlawful search

_____

[11] Rey also emphasizes certain inconsistencies regarding the timing of the entry between Doering's testimony and a report he filed, which states that officers forced entry after receiving a warrant. See Defendant's Exhibit L at 1. Given the workings of the independent-source doctrine, this discrepancy is immaterial.

were removed from the picture, the officers would still ultimately have successfully obtained a warrant and seized the plants under that warrant. Nothing about the security sweep was a factor in the decision to obtain a warrant, the officers' ability to get a warrant, or the ultimate successful seizure of marijuana plants pursuant to the warrant. The independent-source doctrine thus applies and the seizure of marijuana under the warrant was valid under the Fourth Amendment.

## IV. NO MATERIAL INFORMATION WAS OMITTED IN OBTAINING THE SEARCH WARRANT.

At this point, the Court has determined that the warrant is valid and that no other unlawful search requires that the Court suppress any evidence as fruit of the poisonous tree. Rey has one last challenge to the warrant. He argues that Doering's failure to tell Judge Eichwald that Doering lacked the jurisdiction to operate in Sandoval County was a material omission that fatally undermines the warrant under Franks v. Delaware. Any problem with Doering or the other officers' jurisdiction, however, was not material to the constitutional requirements of the warrant and so Doering's omission is irrelevant to the warrant's validity under the Fourth Amendment.

The parties dispute whether Doering in fact had jurisdiction, but, as the United States asserts, that dispute is ultimately beside the point. Doering indicates that Lucero at one point told him that he could consider his commission revoked. See I Tr. at 169:24-170:7 (Doering). There are also indications, however, that the potential revocation was more conditional, based upon whether Doering would have a Sandoval County officer corroborate the warrant. See I Tr. at 133:1-4 (Lucero), id. at 143:13-144:6 (Lucero & Braun). Regardless whether Trujillo ordered the commission revoked or not, and regardless whether Trujillo could revoke a commission in such a manner, Doering's status in Sandoval County is not relevant.

While Franks v. Delaware's rule applies to material omissions, see United States v. Avery,

-50-

295 F.3d at 1166, that rule relates to information that "is necessary to the finding of probable cause," Franks v. Delaware, 438 U.S. at 156.  Warrants are not rendered infirm when an officer is not forthcoming with information that is immaterial to the probable-cause determination.  "In a case where the defendant alleges information was intentionally omitted from an affidavit, the existence of probable cause is determined by examining the affidavit as if the omitted information had been included and determining whether the affidavit would still give rise to probable cause."  United States v. Basham, 268 F.3d at 1204.  Not any information that is important or could be interesting to a judge contemplating whether to issue a warrant must be disclosed under Franks v. Delaware.  Information related to Doering's authority to operate in Sandoval County would not have changed Judge Eichwald's analysis of probable cause because that information had nothing to do with whether Doering was presenting sufficient evidence of marijuana growing on Rey's property near Jemez Springs to justify the issuance of a search warrant.

One illustration of the principle that Franks v. Delaware is concerned with probable cause is found in United States v. Basham.  In that case, an officer obtained a search warrant for the defendant's house but did not, the defendant contended, inform the issuing magistrate "that the media would be present during the execution of the warrant and that the [the officers were] planning a high-risk execution of the warrant at a time when there would be minor children in the home." 268 F.3d at 1204.  Both pieces of information could be considered, in a general sense, important or material, and a magistrate might well be interested in knowing if police executing a warrant were going to do so in the presence of the media or were intending to execute the warrant in a manner that might endanger young children.  Nonetheless, the Tenth Circuit held that, even if the defendant's contentions were true, the alleged omissions would not touch upon the existence of probable cause. See id.  As the Tenth Circuit stated: "Had information pertaining to the presence of children and a

-51-

television crew been included in the warrant, probable cause would still exist."  Id.

Similarly, if information about Doering's alleged lack of jurisdiction in Sandoval County, or, at a minimum, information about the dispute over his jurisdiction, had been given to Judge Eichwald, the probable-cause calculus would remain unaffected.  Doering's status says nothing about whether there was marijuana growing on the Jemez property.  His failure to tell Judge Eichwald about the matter does not void the warrant under Franks v. Delaware.

This conclusion is reinforced by Tenth Circuit precedent holding that the jurisdiction of a state police officer to execute a warrant is irrelevant to determining whether there has been a federal constitutional violation requiring the suppression of evidence.  As a general matter, whether there has been a violation of the Fourth Amendment in a federal prosecution "'must be determined by Federal law even though the police actions are those of state police officers.'"  United States v. Le, 173 F.3d at 1264 (quoting United States v. Miller, 452 F.2d at 733).  Thus, whether evidence seized under a state warrant is to be suppressed in federal court depends only on the application of federal standards, and "[t]he fact that the arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under the Federal Constitution were not offended."  United States v. Le, 173 F.3d at 1265 (internal quotation marks omitted).

In United States v. Green, the Tenth Circuit addressed the specific situation of a defendant contending that the police officers who "investigated him, obtained warrants to search his residence, and executed that warrant were acting outside their jurisdiction."  178 F.3d at 1105.  The Tenth Circuit stated that "the Fourth Amendment requires only that the warrant contain 'probable cause supported by an oath or affirmation and a particular description of the place, persons and things to be searched and seized.'"  United States v. Green, 178 F.3d at 1106 (quoting United States v. Wicks, 995 F.2d at 972).  Accordingly, the Tenth Circuit held that "[t]he Fourth Amendment is satisfied

where . . . officers obtain a warrant, grounded in probable cause and phrased with sufficient particularity, from a magistrate of the relevant jurisdiction authorizing them to search a particular location, even if those officers are acting outside their jurisdiction as defined by state law." United States v. Green, 178 F.3d at 1106.

The circumstances in United States v. Green are legally indistinguishable from the situation here.  Just as in United States v. Green, Rey is contending here that Doering was acting beyond his authorized jurisdiction when he obtained and helped execute a warrant in Sandoval County.  United States v. Green holds that an officer's jurisdiction or lack of jurisdiction under state law is irrelevant to whether the officer's obtaining or executing a warrant is valid under the Fourth Amendment. Thus, Doering had no obligation to tell Judge Eichwald about the status of Doering's jurisdiction. Because Doering's jurisdictional status in Sandoval County is irrelevant under the Fourth Amendment, Doering's omission of information regarding his status is immaterial and not a violation of Franks v. Delaware.

Rey cites United States v. Richardson, 86 F.3d 1537 (10th Cir. 1996), in support of the proposition that officers' exceeding their jurisdiction is a basis for suppression.  In that case the Tenth Circuit noted that it was not "prohibited from considering state law," but that it must "conduct an independent inquiry and apply federal law," with considerations of state law allowed to neither "enlarge nor diminish federal law." Id. at 1544.  Oklahoma courts had held that an officer acting outside of his or her jurisdiction was grounds for suppression, but the Tenth Circuit found no violation of state law.  See id.  United States v. Richardson did not hold that, had there been a violation, federal law would mandate suppression.  The Tenth Circuit's discussion of the state law neither enlarging or diminishing federal law suggests that it would not.  In United States v. Green, the Tenth Circuit, discussing United States v. Richardson and similar cases, emphasized that those

cases used the lack of a state-law violation only as one way of resolving the cases and did not support any such violations requiring suppression.  See 178 F.3d at 1105-06.

Rey also cites Ross v. Neff, which held that a warrantless arrest by an officer acting outside his jurisdiction was unlawful.  The Tenth Circuit discussed that case too, however, in United States v. Green, with the Tenth Circuit refusing to extend its holding to officers obtaining information, applying for warrants, or executing warrants outside their jurisdiction.  See 178 F.3d at 1106.  In sum, the Tenth Circuit, in United States v. Green, considered and rejected both lines of reasoning that Rey advances here.

Between United States v. Basham, which holds that information unrelated to probable cause does not need to be disclosed in a search warrant affidavit, and United States v. Green, which holds that an officer's jurisdiction under state law is irrelevant to a Fourth Amendment inquiry, the Court concludes that Doering's failure to provide Judge Eichwald information about Doering's jurisdiction does not violate Franks v. Delaware.  If Rey is correct that Doering's authority to operate in Sandoval County had been revoked, and that this revocation removed his authority under state law to execute a warrant in Sandoval County, that fact would not have any bearing on Fourth Amendment questions.  Accordingly, the Court will not invalidate the warrant.  With Rey's last challenge unsuccessful, the Court finds no sound basis for suppressing any of the evidence that was seized from Rey's property.

IT IS ORDERED that the Defendant's Motion to Suppress Evidence Obtained From Illegal Search is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Gregory J. Fouratt
   United States Attorney
James R.W. Braun
Nicholas Jon Ganjei
   Assistant United States Attorneys
Albuquerque, New Mexico

       *Attorneys for the Plaintiff*

Robert Jason Bowles
Bowles and Crow
Albuquerque, New Mexico

-- and --

Robert J. Gorence
Marie T. Legrand
Gorence & Oliveros, P.C.
Albuquerque, New Mexico

       *Attorneys for the Defendant*